**MAY TRUCKING COMPANY,**
**Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Respondents,**

**Anthony G. Ayala, d/b/a Queen City Trucking, Intervenor.**

**No. 76–2068.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1978.

Decided Feb. 7, 1979.

---

**82.** *See* 15 U.S.C. § 1410(b)(3)(A) (1976).

**83.** 182 U.S.App.D.C. 21, 28, 559 F.2d 642, 649 (*en banc*) (*per curiam*), *aff'd*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977).

J. Michael Alexander, Salem, Or., for petitioner.

Carl E. Howe, Jr., Atty., I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Robert S. Buck, Deputy Gen. Counsel, I.C.C., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Ronald P. Erickson, Seattle, Wash., was on brief, for intervenor.

Before ROBINSON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Spottswood W. Robinson, III, Circuit Judge.

Spottswood W. Robinson, III, Circuit Judge:

■ May Trucking Company, the petitioner, challenges the grant by the Interstate Commerce Commission of a certificate of public convenience and necessity authorizing motor carrier operations by Anthony G. Ayala, the intervenor.[1] Two of May's contentions give us little pause,[2] but its remaining claim that the Commission's decision is unsupported by substantial evidence warrants somewhat extended comment. Our review ultimately persuades us that the Commission's action has sufficient foundation in the record, and accordingly must be upheld.

## I

Ayala sought authority to carry specified commodities between points in Idaho, Montana, Oregon and Washington. May and fourteen other carriers noted their opposition, and the ensuing litigation has taken a

---

1. *Anthony G. Ayala,* I.C.C. No. M.C.–135519 (Sub No. 5) (Div. 1 Apr. 22, 1976) (unreported), Joint Appendix (J.App.) 95.

2. May argues that the Commission erred in refusing to follow its decision rejecting a similar application filed by Ayala a few years earlier and in according decisional weight to Small Business Administration loans to Ayala.

The earlier application was for essentially the same authority. It was initially granted but was later denied by the Commission. *Anthony G. Ayala,* 120 M.C.C. 500 (Rev.Bd.No. 1 1973), aff'd, *Ayala v. United States,* No. 74–1595 (W.D.Wash. Aug. 6, 1974) (unreported). Ayala introduced different evidence in support of his second application. Quite obviously, the failure to prove in one proceeding that the public convenience and necessity warrant new service does not mean that better evidence cannot suffice for a subsequent application. The Commission apparently has not imposed any rules precluding relitigation of issues of this type, and nothing in its governing legislation requires it to do so.

The issuer over the SBA loans, as posed by May, is whether the administrative law judge was prompted to grant the application because otherwise Ayala's business might fail and resultantly he might default on the loans. We need not pass on the propriety of such a course of reasoning. The judge explained that he considered the SBA loans only for purposes of ascertaining whether "Mr. Ayala is fit, willing, and able to conduct the proposed operations." *Anthony G. Ayala,* I.C.C. No. M.C.–135519 (Sub No. 5), at 36 (initial decision Oct. 29, 1975) (unreported) J.App. 47. We are afforded no ground for probing behind the stated rationale for some other unexpressed use of the information.

normal course. The applicant, supporting shippers and the protesting carriers presented evidence at five days of hearings. The administrative law judge presiding rendered an initial decision in favor of Ayala,[3] to which the opposing parties filed exceptions. The Commission entered an order affirming essentially on the basis of the judge's opinion,[4] and subsequently denied petitions for reconsideration.[5]

The administrative law judge and the Commission successively narrowed the scope of Ayala's certificate with respect to the commodities and territory involved. In the end, Ayala obtained authority to carry iron and steel products from Seattle, Tacoma and Portland to Spokane and points in Idaho and Montana; scrap metal from points in Idaho and Montana to Seattle, Tacoma and Portland; and hides from points in Montana to Seattle, Tacoma and Portland, as well as from points in Idaho except Nampa and Caldwell, to Seattle and Tacoma.[6]

May challenges the grant insofar as it permits the hauling of iron and steel products from Portland to points in southern Idaho[7] and scrap metal from southern Idaho to Portland and Seattle.[8] May contends primarily[9] that the evidence does not suffi-ciently indicate that Ayala's operations in those areas would serve the public convenience and necessity, and would do so without grave injury to May. We discuss these complaints seriatum.

## II

To garner our approval, the Commission's decision must be supported by substantial evidence.[10] That can be "something less than the weight of the evidence,"[11] but the bare minimum is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[12] Beyond that, the decision must be neither "arbitrary, capricious, [nor] an abuse of discretion."[13] Mindful of these guiding premises, we turn to examine the evidentiary foundation of the Commission's decision. The Commission's guidelines for a prima facie case[14] summon the applicant to prove a public need for the proposed new service that existing carriers do not meet.[15] This is usually accomplished through evidence supplied by supporting shippers.[16] Of particular relevance here is the Commission's insistence that shippers have reasonably thorough knowledge of the capabilities of those carriers,[17] and that the evidence support the sought-after authority in all of

---

3. *Anthony G. Ayala, supra* note 2.

4. *Anthony G. Ayala, supra* note 1.

5. *Anthony G. Ayala,* I.C.C. No. M.C.–135519 (Sub No. 5) (order on petition for reconsideration Sept. 30, 1976) (unreported), J.App. 96.

6. *Anthony G. Ayala, supra* note 1.

7. Southern Idaho is defined for these proceedings as that part of the state south of Idaho County.

8. These are the areas in which the certificates conferred by the Commission upon May and Ayala overlap.

9. See note 2 *supra.*

10. *Bowman Transp. Co. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447, 454–455 (1974); Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(E) (1976).

11. *Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 141 (1966).

12. *Id.,* 383 U.S. at 620, 86 S.Ct. at 1026, 16 L.Ed.2d at 140, quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938).

13. Administrative Procedure Act § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (1976).

14. The burden is on the applicant to show that the prospective service "is or will be required by the present or future public convenience and necessity . . . ." Interstate Commerce Act, § 207(a), 49 U.S.C. § 307(a) (1970); *Quickie Transp. v. United States,* 169 F.Supp. 826, 828 (D.Minn.), *aff'd,* 361 U.S. 36, 80 S.Ct. 140, 4 L.Ed.2d 111 (1959).

15. *Pan American Bus Lines Operations,* 1 M.C.C. 190, 203 (1936).

16. *Youngstown Cartage Co. v. ICC,* 187 U.S. App.D.C. 294, 295, 571 F.2d 1243, 1244, *cert. denied,* —— U.S. - ——, 99 S.Ct. 97, 58 L.Ed.2d 119 (1978).

17. *Warren Transp., Inc.,* 69 M.C.C. 241, 246 (1956).

its breadth.[18] On the other hand, there is no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope may be awarded. Were it otherwise, certificates would be cumbersome and perhaps confusing; carriers often could not assure themselves of the economy of full loads and backhauls; and the Commission would be denied the normally reasonable inference that what is true for a fair sampling of localities is probably true for most. Thus, all that is required is evidence portraying the situation at a representative number of points.[19]

■ Ayala's presentation focused on asserted inadequacies of the service furnished by existing carriers—in particular, unacceptable delays and carrier disinclination to haul scrap metal because of accompanying damage to their equipment. The evidence certainly indicated that,[20] and tended also to show that Ayala could provide service free from those deficiencies.[21] Ayala had operated for a time under temporary authority[22] and his customers, of course, had enjoyed an opportunity to assess his performance. The administrative law judge found that Ayala "ha[d] provided excellent service for the shippers supporting [his] application, a service which insofar as these shippers collectively are concerned is markedly superior to the services offered by protestants."[23] Our independent review of the record convinces us that the judge had heard enough to justify that overall conclusion.

### III

■■ May argues, with considerable cogency, that while the data supplied by shippers supporting Ayala would have warranted approval of additional carriage to and from northern Idaho, the evidence is too sparse to sustain that outcome for southern Idaho.

We are satisfied, however, that there was substantial evidence to support the validity of the administrative law judge's generalization for southern Idaho as well as for other parts of the area certificated. To be sure, May has operating authority for southern but not northern Idaho, and thus an inference of need for service in southern Idaho exclusively from proof of deficient service in northern Idaho might be hazardously speculative. It must be remembered, however, that in fashioning operating au-

---

18. *John Novak Contract Carrier Application,* 103 M.C.C. 555, 556–557 (1967). See also *C & H Transp. Co. v. ICC,* 191 U.S.App.D.C. 42, 589 F.2d 565 (1978).

19. *John Novak Contract Carrier Application, supra* note 18, 103 M.C.C. at 557. We recently reversed the Commission's grant of an application for *temporary* authority to and from entire states that was unsupported by data "relating to 'a representative number of points in each such State . . . .'" *Barrett Mobile Home Transp., Inc. v. ICC,* 185 U.S.App.D.C. 283, 284 & n.7, 567 F.2d 150, 151 & n.7 (1977), quoting 49 C.F.R. § 1131.4(b)(1)(i) (1976). The Commission has no comparable regulation calling upon applicants to support their pleas for *permanent* certificates in this particular manner. We are not told why a different standard should apply, but we deem the divergence in rules unimportant here. What is legally required is shaped, of course, by the particular factual context, and the basic question in this case is still whether an inference of similarity throughout the area embraced by Ayala's certificate could rationally be drawn from the evidence presented.

20. See *Anthony G. Ayala, supra* note 2, at 12 (initial decision) J.App. 23 (evidence that other carriers dislike the "destructive effect of scrap upon the carrier's vehicles"); *id.* at 14–15, J.App. 25–26 (existing carriers will haul scrap metal only when there is nothing else to haul, but Ayala provided "prompt, courteous service"). See Hearing Transcript (Tr.) 88 (testimony of witness from Harmer's Steel Products, a shipper of iron and steel products to points in northern Idaho) (other carriers do not like less-than-truckload shipments and deliver late; in general, their service is "just plain lousy"). See also text *infra* at notes 28–42.

21. See note 20 *supra* and text *infra* at notes 28–42.

22. See Interstate Commerce Act, § 210a, 49 U.S.C. § 310a (1970), discussed in *Barrett Mobile Home Transp., Inc. v. ICC, supra* note 19, 185 U.S.App.D.C. at 284, 567 F.2d at 151.

23. *Anthony G. Ayala, supra* note 2, at 35 (initial decision), J.App. 46.

thorities the Commission has to chart boundaries, a matter involving numerous practical considerations. This kind of line-drawing is to be left to the agency's judgment unless "patently unreasonable."[24] What was necessary here, but all that was necessary, was enough of a presentation specifically related to points in southern Idaho to enable an informed decision by the Commission on Ayala's request to serve that area.[25] That, we think, was made.

■ To begin with, many of the carriers whose service in northern Idaho plainly was indicted also operated in the remainder of the state. It would not surpass reason to presume that their performance did not vary dramatically with a change in latitude. More importantly, this is not a case in which operating authority is extended over large territories without a shred of direct supporting evidence.[26] Under his temporary operating authority Ayala had served southern Idaho, as well as other areas, and there were shippers who spoke to the situation there.[27] Some of their testimony specifically attacked existing trucking service

in southern Idaho, including that furnished by May.

Sternoff Metals ships scrap primarily out of the Idaho panhandle. Sternoff attempts, however, to purchase that type of cargo all over the state, and it has had isolated shipments out of the south.[28] Sternoff tried to obtain service from May and one other carrier, but neither compared favorably to Ayala.[29] Sternoff declared that with Ayala available it would be willing and able to develop the southern market further.[30]

Sentry Automatic Sprinkler Company likewise was dissatisfied with the service available for shipment of its unassembled firesprinkler systems[31] from Tacoma to points in southern as well as northern Idaho.[32] May argues that this evidence is infirm because Sentry had not tried all of the truckers already certificated. Other evidence discloses, however, that Sentry had utilized a total of six carriers and was familiar with two others, but found their service deficient because of Sentry's need for fast and certain delivery.[33] Besides, we cannot subscribe to May's legal premise in

**24.** *Home Box Office, Inc. v. FCC,* 185 U.S.App. D.C. 142, 193, 567 F.2d 9, 60 (1977).

**25.** See text *supra* at notes 10–11; *Doe v. Hampton,* 184 U.S.App.D.C. 373, 390, 566 F.2d 265, 282 (1977); *cf. id.* 184 U.S.App.D.C. at 396 n.22, 566 F.2d at 288 n.22 (dissenting opinion).

**26.** Compare *Barrett Mobile Home Transp., Inc. v. ICC, supra* note 19, 185 U.S.App.D.C. at 285–286, 567 F.2d at 152–153.

**27.** See Applicant's Hearing Exhibit 9 (abstract of 200 Ayala shipments during period of temporary authority) (steel products from Portland to Nampa, from Seattle to Boise, and from Seattle to Nampa; scrap metal from Pocatello to Seattle).

**28.** *Anthony G. Ayala, supra* note 2, at 12–14 (initial decision), J.App. 23–25 ("Sternoff . . . considers that there are potential scrap markets everywhere and that even though the majority of its scrap from Idaho has come from the Kellogg area, that does not exclude the possibility of scrap coming from southern Idaho"); Tr. 126–127 (potential market throughout Idaho); Tr. 141 (isolated shipments from all over Idaho).

**29.** *Anthony G. Ayala, supra* note 2, at 13 (initial decision), J.App. 24.

**30.** Tr. 132; accord, *Anthony G. Ayala, supra* note 2, at 11 (initial decision), J.App. 22; Tr. 88–90 (Harmer's Steel Products would extend its iron and steel market into southern Idaho if it could use Ayala's reliable service).

**31.** The administrative law judge held that this material falls within the category of iron and steel articles. *Anthony G. Ayala, supra* note 2, at 19 (initial decision), J.App. 30. May's retort is that sprinkler systems do not appear in the Commission's listing of iron and steel articles, citing *Descriptions in Motor Carrier Certificates,* 61 M.C.C. 209, 276 (1953) (App. 5). We agree with the judge that the listing cited is descriptive and that the presence of brass sprinkler heads in an otherwise iron-and-steel system is de minimus. See *Atlanta-New Orleans Motor Freight Co.,* 69 M.C.C. 257, 261 (Div. 1, 1956) (iron-and-steel articles authority may include items not on the 1953 list).

**32.** *Anthony G. Ayala, supra* note 2, at 18–19 (initial decision), J.App. 29–30; Tr. 221–222, 224, 229.

**33.** *Anthony G. Ayala, supra* note 2, at 18–19 (initial decision), J.App. 29–30.

this regard. A supporting shipper need not have had experience with every carrier already on the scene. It is essential only that the sum of the evidence indicate persuasively that existing carriers are unable or unwilling to provide the kind or level of service desired.[34]

Pacific Hide & Fur Company, a shipper of scrap metal, has among its principal sources Nampa and Salmon, two towns in southern Idaho.[35] The company had a hard time finding satisfactory carriage for its scrap, but was quite pleased with Ayala.[36] The spokesman for Pacific Hide had little knowledge of much of his company's traffic,[37] and little specific information on what carriers, other than one, had been tried.[38] But it cannot be gainsaid that he espoused Pacific Hide's general opinion on its needs.

Similarly, Myers Pacific ships iron and steel products from Seattle and Portland to Idaho. Regular shipments are made to Pocatello, in southern Idaho.[39] There was a witness from its Seattle office, but southern Idaho is served by Portland,[40] and this witness had only meager personal knowledge of service problems to the south.[41] He was, however, able to testify that the service Myers Pacific had received from a number of existing carries was unacceptable, and that his company believed Ayala would usher in an era of substantial improvement.[42]

 In short, while the evidence of need for and expected benefit from Ayala's proposed service in southern Idaho was far from compelling, it sufficed to support the Commission's decision on that score. Despite its weakness, we regard it as such that "a reasonable mind might accept as adequate to support a conclusion," [43] and plainly "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." [44]

## IV

 With that, our inquiry shifts to the Commission's disposition of the question whether there would be any injury to May or other existing carriers outweighing the public benefits of Ayala's new service. May does not challenge the administrative law judge's findings that

[r]elative to adverse effect upon the protestants, nothing material was experienced by them from applicant's past service [under temporary authority]. Moreover, scarcely any adverse effect would be visited upon them through applicant's prospective service for the supporting shippers as the latter are not presently served by protestants to any material extent.[45]

May points out, however, that Ayala is also free to serve shippers who did not testify in his behalf, and that some of May's business would thus be vulnerable to diversion by Ayala. May documented its thesis with an

**34.** See cases cited *supra* notes 17–19.

**35.** *Anthony G. Ayala, supra* note 2, at 24 (initial decision), J.App. 35; Tr. 401, 406.

**36.** *Anthony G. Ayala, supra* note 2, at 24–25 (initial decision), J.App. 35–36.

**37.** A vice president of the company who had planned to appear was unable to be present. Tr. 393.

**38.** *Anthony G. Ayala, supra* note 2, at 25 (initial decision), J.App. 36.

**39.** *Id.* at 19, J.App. 30; Tr. 260, 267.

**40.** *Anthony G. Ayala, supra* note 2, at 20 (initial decision), J.App. 31.

**41.** Hearsay generally is admissible in administrative hearings. *E. g., Brown v. Gamage,* 126 U.S.App.D.C. 269, 273, 377 F.2d 154, 158, *cert.*

*denied,* 389 U.S. 858, 88 S.Ct. 103, 19 L.Ed.2d 125 (1967).

**42.** *Anthony G. Ayala, supra* note 2, at 20–21 (initial decision), J.App. 31–32.

**43.** See text *supra* at note 12.

**44.** *Consolo v. FMC, supra* note 11, 383 U.S. at 620, 86 S.Ct. at 1026, 16 L.Ed.2d at 141.

**45.** *Anthony G. Ayala, supra* note 2, at 35 (initial decision), J.App. 46. Compare *ICC v. J–T Transp. Co.,* 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147, 156–157 (1961) ("where the protesting carriers do not presently have the business, it would seem that the grant of it to a newcomer would have an adverse effect on them only in the unusual case").

abstract of shipments suggesting that Ayala could compete for business comprising more than $87,000 of May's revenues.[46]

We are no more impressed by this argument than was the Commission, for it is largely beside the point. Competition frequently entails a loss of customers, but ordinarily it is in the public interest,[47] not contrary to it.[48] It was incumbent upon May to show not merely that Ayala would compete with other carriers and might succeed in luring some of their customers away, but that Ayala's operations would likely promote inefficiency and waste or destroy May's ability to compete.[49]

 Injury to existing carriers through competition becomes relevant only when there is corresponding injury to the public. Congress designed the Interstate Commerce Act to benefit the people, not to create protected monopolies for those who profess to serve the public.[50] The Commission did not exceed the bounds of its rightful discretion in concluding that on balance the public would profit from a grant of Ayala's application.

We thus find no error in the Commission's treatment of the application or in its disposition of the opposition thereto. The decision under review is accordingly

*Affirmed.*

---

**46.** May's Hearing Exhibit 54, discussed in *Anthony G. Ayala, supra* note 2, at 31 (initial decision), J.App. 42.

**47.** See *P. C. White Truck Line, Inc. v. ICC,* 179 U.S.App.D.C. 367, 369, 551 F.2d 1326, 1328 (1977); *Sawyer Transp., Inc. v. United States,* 565 F.2d 474, 478 (7th Cir. 1977); *Highland Tours, Inc.,* 128 M.C.C. 595, 603 (Div. 1 1977) ("[a] carrier first in business has no absolute immunity against future competition. Even though the resulting competition may cause a carrier already providing service to lose revenue, the issuance of new authority may best serve the public convenience and necessity . . . .").

**48.** See *P. C. White Truck Line, Inc. v. ICC, supra* note 47, 179 U.S.App.D.C. at 369, 551 F.2d at 1328, quoting *Bowman Transp. Co. v. Arkansas-Best Freight Sys., Inc., supra* note 10, 419 U.S. at 298, 95 S.Ct. at 448, 42 L.Ed.2d at 463 ("[t]he Commission . . . is entitled to conclude that preservation of a competitive structure in a given case is overridden by other interests").

**49.** See *Latin Express Serv., Inc.,* 128 M.C.C. 740, 746–747 (Comm'n 1978) (evidence merely of potential diversion of traffic is inadequate "to establish that the authorization of the service proposed by applicant would endanger or impair [existing carriers'] operations"); *Wayne Daniel Truck, Inc.,* 128 M.C.C. 1, 9 (Div. 1 1977) ("we do not perceive that any diversion of traffic from protestant would adversely affect their continued ability to provide service to the public"). See also *Pan American Bus Lines Operation, supra* note 15, 1 M.C.C. at 203 (test is whether new service can be provided "without endangering or impairing the operations of existing carriers *contrary to the public interest*") (emphasis supplied). In *P. C. White Truck Lines, Inc. v. ICC, supra* note 47, 179 U.S.App.D.C. at 369, 551 F.2d at 1328, we noted the Supreme Court's approval in *Bowman Transp. Co. v. Arkansas-Best Freight Sys., Inc., supra* note 10, of the Commission's conclusion "that the wholesomeness of competition overshadowed any adverse effects upon other carriers . . . ."

**50.** *Northwest Transp. Serv., Inc.,* 128 M.C.C. 622, 625–626 (Div. 1 1977) ("[w]hile we recognize the authority granted will conflict with protestants' authority, existing carriers are not entitled to remain immune from competition"). See also note 47 *supra.*