REFRIGERATED TRANSPORT COM-
PANY, INC., and Seawheels,
Inc., Petitioners,

v.

The INTERSTATE COMMERCE COM-
MISSION and the United States of
America, Respondents.

No. 79–2539
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

May 5, 1980.

* Fed.R.App.P. 34(a);  5th Cir. R. 18.

Serby & Mitchell, Alan E. Serby, Atlanta, Ga., for petitioners.

Denise M. O'Brien, Atty., I.C.C., Ron M. Landsman, Antitrust Div., Dept. of Justice, John J. Powers, III, Washington, D. C., for I.C.C.

Arnold L. Burke, Chicago, Ill., for Intervenor Belford Trucking Co., Inc.

Before GODBOLD, REAVLEY and ANDERSON, Circuit Judges.

**PER CURIAM:**

Petitioners, Refrigerated Transport Co., Inc. and Seawheels, Inc., bring this action to reverse an order of the Interstate Commerce Commission granting Belford Trucking Company a certificate of public convenience and necessity to operate as a common carrier over irregular routes transporting frozen fruits and vegetables from Jacksonville, Florida, to points in Florida, restricted to the transportation of traffic having immediately prior movement by water. We affirm the ICC's license grant insofar as it gives Belford operating authority between Jacksonville and the supporting shipper's plant at Plant City, Florida. We reverse the order to the extent that it grants Belford operating authority to destination points other than Plant City, Florida, and we remand the case to the ICC for further proceedings consistent with this opinion.

Belford applied for a certificate of public convenience and necessity authorizing it to operate as a motor common carrier over irregular routes, to transport frozen fruits and vegetables from Jacksonville, Florida, to points in Florida, restricted to traffic having an immediately prior movement by water. Belford's application was supported by evidence of its fitness, willingness and ability to provide the proposed service and by the statement of a single shipper, Southland Frozen Foods, Inc. Petitioners, Refrigerated Transport and Seawheels, filed timely objections to Belford's application and supported their objections with verified statements.[1] By order served January 12, 1979, the ICC granted Belford's license application. Petitions for administrative re-

view were denied by order served May 1, 1979. Petitioners ask this Court to review both the grant of operating authority and the scope of that authority. They allege that the decision of the ICC to grant any operating authority is not supported by substantial evidence. They also allege that the decision to grant *statewide* operating authority from an origin point at Jacksonville, Florida, is not supported by substantial evidence, *i. e.*, it grants statewide operating authority on the basis of evidence relating only to service needed between Jacksonville and Plant City, Florida, and that it is capricious and contrary to law because it fails to properly exercise a balancing of the appropriate criteria. They do not challenge the ICC's findings on the fitness, willingness and ability of the applicant carrier to provide the proposed service.

## THE LICENSE APPLICANT'S BURDEN

The task of the license applicant, Belford Trucking Company, was to demonstrate to the ICC Belford's fitness, willingness and ability to provide the proposed service, and to show that the service is or will be required by public convenience and necessity.[2] In applying the public convenience and necessity aspect of the test, the ICC is guided by the criteria set forth in *Pan Am Buslines Operation*, 1 M.C.C. 190 (1936). There, the Commission explained what it means to show that a proposed service is or will be required by the present or future public convenience and necessity.

> The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public

---

1. Belford's application was submitted under the ICC's "Modified Procedure," a method which makes it possible to handle cases with limited or no oral hearings as provided by 49 C.F.R. § 1100.5(j) and 49 C.F.R. §§ 1100.43 to 1100.52 (1978).

2. The standards for the issuance of certificates to motor carriers appear in 49 U.S.C. § 10922(a) [formerly 49 U.S.C. § 307(a)] and provide in pertinent part:

    (a) except as provided in this section and 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transporta-

tion subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier or water common carrier respectively, if the Commission finds that—

    (1) the person is fit, willing, and able—
      (A) to provide the transportation to be authorized by the certificate; and
      (B) to comply with this subtitle and regulations of the Commission; and
    (2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

demand or need; whether this purpose can and will be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

1 M.C.C. 190, 203. The *Pan Am* guidelines make clear that the Commission, in evaluating an application, is required to balance the advantages of the proposed service to the public against the possible disadvantages to competing carriers.

■ Usually, an applicant meets the requirement of showing a public need for the proposed new service that existing carriers do not meet through evidence supplied by supporting shippers. *May Trucking Co. v. U. S.*, 593 F.2d 1349 (D.C.Cir.1979). In *John Novak Contract Carrier Application*, 103 M.C.C. 555 (1967), the Interstate Commerce Commission explained that shippers supporting an application for operating authority should, as the minimum showing to prove an applicant's prima facie case, " 'identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing services.' " 103 M.C.C. 555, 557. Petitioners concede that the *Novak* criteria are not mandatory in every case, but urge that they are useful to a reviewing court in determining whether substantial evidence exists for the Commission's findings.

## THE STANDARDS OF JUDICIAL REVIEW

■ Our task, as a court reviewing an agency decision, is to determine whether that agency's findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A and E). *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). There, the Supreme Court ruled, "(U)nder the 'arbitrary and capricious' standard the scope of review

is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . .. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' " 419 U.S. at 285, 95 S.Ct. at 442, quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ In *Chem-Haulers, Inc. v. United States*, 536 F.2d 610, 617 (5th Cir. 1976), this Court noted that the Supreme Court has defined "substantial evidence" in the context of court review of an administrative agency decision as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' " *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo, supra*, 383 U.S. at 620, 86 S.Ct. at 1026, citing to other cases. The *Consolo* "substantial evidence" standards apply to judicial review of ICC grants of operating authority to a carrier. *Chem-Haulers, supra*, 536 F.2d at 617; *Florida Terminals & Trucking Co. v. United States*, 363 F.Supp. 1355, 1360 (M.D.Fla. 1973).

## THE EVIDENCE

Our review of the evidence in this case persuades us, in light of the *Pan Am* guidelines, *supra*, and the *Novak* criteria, *supra*, that the Commission's decision was supported by substantial evidence, but only to the extent that the license grants Belford authority to transport frozen fruits and vegetables to the supporting shipper's plant at Plant City, Florida. The evidence

showed clearly that the commodities shipped by the supporting shipper were frozen fruits and vegetables. The evidence showed that the points between which the traffic moved were Jacksonville and Plant City, Florida.[3]

Although the supporting shipper did not specify precisely what volume of freight was to be tendered to the applicant, it made the following statement related to its import volume:

Southland Frozen Foods, Inc. imports from our division in the Dominican Republic approximately 4,000,000 pounds of product per year through the ports of Miami and Jacksonville, Florida. These products are entered in house-to-house containers at a rate of between 5 and 25 containers per month, depending on the particular product and the growing seasons. Depending on equipment availability and other variables of an operational nature, we can estimate that Belford Trucking Company, Inc. could reasonable [sic] expect to transport approximately 50% of this volume. All of this merchandise, whether entered through Miami or Jacksonville would be consigned to our warehouse at Plant City, Florida.

As is readily apparent, there was no clear identification of the volume of imported product which entered through Jacksonville, the only port at issue in this application. The ICC review board found that the

amount of traffic involved is "substantial," and the ICC acting as an appellate division did not disturb that finding. We think that the Commission could reasonably have concluded, in light of the evidence before it, that the volume of freight to be tendered to the applicant would be "substantial." We therefore find the Commission's conclusion supported by substantial evidence.

Similarly, we find that the conclusion of the Commission[4] that the applicant, through its supporting shipper, had demonstrated a need for additional service is supported by substantial evidence. Supporting shipper Southland identified Refrigerated Transport and Seawheels as carriers which provided transportation for its traffic.[5] Southland asserts that while its experience with Refrigerated Transport has been satisfactory, it has a "very definite need for additional service in this traffic." The statement of supporting shipper, Southland Frozen Foods, Inc., reads, in pertinent part:

These containers [containing frozen fruits and vegetables] are all brought into the ports by member lines in the U.S. Atlantic and Gulf—Santo Domingo conference. There is a provision in the tariff of this conference that allows the shipper 48 hours of 'free time', after the ship is unloaded, to make his entry through U.S. Customs, clear the merchandise through the Food and Drug Administration inspection and arrange for a motor carrier to move the container off the pier. The

---

3. Belford applied for operating authority between an origin point at Jacksonville, Florida, and destination "points in Florida." The evidence of the sole supporting shipper showed that its commodities moved between origin points at Miami, and Jacksonville, Florida, and a single destination point at Plant City, Florida. Taking the statements of the applicant and the supporting shipper together, we conclude that for the purpose of lending support to Belford's application, the relevant origin and destination points of the supporting shipper's traffic are Jacksonville, Florida, and Plant City, Florida, respectively.

4. Decision of ICC, acting as an Appellate Division, April 25, 1979.

5. The Commission's conclusion that both Refrigerated Transport and Seawheels have moved Southland's products from the Jacksonville origin was erroneous. The verified state-

ment of protestant Seawheels states that its single experience shipping the products of Southland involved transportation from Miami to Plant City, Florida. Seawheels did not transport Southland's products from Jacksonville at any time. In view of the supporting shipper's assertion that it needs services in addition to those now present, however, the Commission's erroneous finding with respect to the services provided by Seawheels was harmless because it exaggerates rather than understates the extent of existing service. That is to say, even in the face of an inflated notion of presently existing services, the Commission found that additional services were needed. Presumably the Commission would not alter its opinion on the need for additional services when confronted with the fact that there is less existing service available than it thought.

demurrage charge for failing to accomplish this amounts to $50 per day per container for each day or part of a day that the cargo does not leave the pier. Because the ships that move these containers do not call at the port on a daily or often not even a weekly basis, we have had as many as 14 containers arrive on shore within the same day. While it is difficult at best, we are able to clear Customs and Food and Drug within the allowed free time with this volume, it is almost impossible to physically move this volume of containers away from the piers within the time left to us before being assessed demurrage at the rates noted above. Because the containers must be returned to the steamship company when unloaded, each container must make a 500 mile round trip in order to complete delivery. It is not reasonable to expect any motor carrier to have available as many as 14 tractors at one particular time and consequently our company has been assessed demurrage charges amounting to over $5,000 per year. Because of the relatively low per pound value of our goods, these additional charges will have an effect on the selling price to our customers.

Refrigerated testified that Southland had never indicated Refrigerated's service to be less than excellent, and Southland itself stated that it has been satisfied with Refrigerated's service.[6] Refrigerated testified further that it had the facilities and equipment, willingness and ability to meet the shipper's transportation needs from Jacksonville to Plant City, Florida.[7] We think that in light of the conflicting evidence before it on the issue of the need for additional service, it was reasonable for the Commission to conclude that "[S]hipper [Southland] has encountered problems obtaining sufficient motor vehicles to transport these containers within 48 hours of the arrival of the boat and thus avoid demurrage charges."[8] The Commission's conclusion that there was a need for additional service was, therefore, supported by substantial evidence.

■ We thus conclude that the grant of authority to Belford Trucking to provide transportation between Jacksonville and Plant City, Florida, with the particular restrictions adopted by the Commission, was supported by substantial evidence. Applicant has demonstrated by substantial evidence that public convenience and necessity require such a grant of authority.

We cannot agree, however, that the scope of the authority granted to Belford, i. e., to provide transportation of the products between Jacksonville and all points in Florida, was warranted by the evidence. We believe the evidence was sufficient only to justify grant of authority between Jacksonville and Southland's facility in Plant City, Florida.

■ We are mindful of the Commission's reluctance to impose plant site restrictions. *Fox-Smythe Transportation Co. Extension—Oklahoma*, 106 M.C.C. 1, 17–18 and 51 (1967).[9] The question before us is whether

---

**6.** Statement of Refrigerated Transport Co., Inc. in Opposition and Statement of Southland [in support], respectively.

**7.** Statement of Refrigerated Transport Co., Inc. in Opposition.

**8.** Decision of ICC, Division 2, acting as an Appellate Division, April 25, 1979, p. 2.

**9.** *Fox-Smythe* teaches that "plant site restrictions" are usually "included in a grant of authority where the exact location of a particular plant is not otherwise identifiable or in order to protect the interests of existing carriers who are necessary and desirable." 106 M.C.C. at 17–18. The Commission makes clear that one reason plant site restrictions are not favored is that a common carrier has a duty to serve the shipping public. Nevertheless, plant site restrictions are not always inconsistent with that duty, the Commission points out. 106 M.C.C. at 17–18. The Commission indicates that "plant site restrictions have been imposed in grants of authority to preclude applicants from serving a vast public far exceeding the limited proof of a need for service shown by a single supplier and hence to protect the established interest of existing carriers." 106 M.C.C. at 51.

In determining the issues before it in the *Fox-Smythe* case, the Commission did impose a plant site restriction. It held as follows: "Inasmuch as the evidence fails to disclose any origin point other than the supporting shipper's Freemont plant, the origin point will be restrict-

Belford has made out a case for providing additional service to destination points other than Southland's facility at Plant City, Florida.[10] We conclude that Belford has not.

When an applicant for a certificate of public convenience and necessity seeks authority to provide transportation to many localities in a large geographical area, it is not necessary that he demonstrate a public convenience and necessity with respect to each point for which he seeks authority. *Miller Transporters, Inc. v. U. S.,* 594 F.2d 463 (5th Cir. 1979). *American Trucking Associations, Inc. v. U. S.,* 373 F.Supp. 252 (W.D.Tex.), *aff'd mem.,* 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 734 (1973); *Packer Transportation Co. v. U. S.,* 596 F.2d 891 (9th Cir. 1979). "[T]here is no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope may be awarded." *May Trucking Co., supra,* 593 F.2d at 1353. What an applicant seeking broad authority must do, however, is to demonstrate "need at numerous representative points." *American Trucking Association, Inc., supra,* 373 F.Supp. at 256. An applicant's "showing of need at numerous representative points raises a rebuttable presumption of a requirement for extended service at those points for which testimony is not available." *Miller Transporters, Inc., supra,* 594 F.2d at 466, quoting from *American Trucking Associations, Inc., supra,* 373 F.Supp. at 256. The Commission may infer from an unrebutted representative showing that the need for service extends beyond the precise localities for which evidence is given.

We expressed the view in *Miller Transporters, Inc., supra,* 594 F.2d 463 (5th Cir. 1979), that there is no precise formula for making a sufficient showing of need to justify a broad grant of authority. There we said "we decline to play a numbers game designed to devise a precise formula as to whether evidence of the need for service at 10 points is enough to justify service at 20 or 30 more." 594 F.2d at 467. We note that in reviewing the scope of authority granted on the basis of evidence relating to only some of the localities, "the basic question . . . is . . . whether an inference of similarity throughout the area embraced by . . . [applicant's] certificate could rationally be drawn from the evidence presented." *May Trucking Co., supra,* 593 F.2d at 1353, n. 19. While we once again decline to play a numbers game, we think that the Commission could not rationally infer from the evidence before it that a statewide grant of operating authority was needed. In the case before us, Belford's application is supported by the statement of a single shipper. That shipper provides evidence with respect to a need between Jacksonville and a single other point within the state of Florida. The applicant has made no showing that the supporting shipper's testimony with respect to the need between those two points is representative of a greater need and there is simply no evidence from which the Commission could infer the existence of a greater need. We therefore conclude that the ICC's grant of authority to Belford Truck-

ed to that plant." 106 M.C.C. at 31. The applicant, Fox-Smythe, had sought a certificate of public convenience and necessity to transport goods "from the plant site and storage facilities utilized by Hormel and Company at or near Freemont, Nebraska, to points in Oklahoma, restricted to traffic originating at such facilities." 106 M.C.C. at 2.

**10.** Plant site restrictions have been found appropriate where the applicant has failed to demonstrate the need for broader authority. In *Kreider Truck Service, Inc. Extension—Land Oils,* 82 M.C.C. 565 (1960), the Commission restricted the applicant's grant of authority to

operation between the supporting shipper's plant site in East St. Louis, Illinois and Memphis, Tennessee. In explaining its decision, the majority stated, "the resulting scope of authority, if the restriction were removed, would afford applicant the opportunity to serve a vast public far exceeding the limited proof of need for service shown by the single supporting shipper." 82 M.C.C. at 567. *See also M.I. O'Boyle & Son, Inc., Extension—Fluorspar,* 88 M.C.C. 559 (1962); *Quickie Transport Co. v. U. S. and Indian-Head Truck Line, Inc.,* 169 F.Supp. 826 (D.Minn.), *aff'd mem.,* 361 U.S. 36, 80 S.Ct. 140, 4 L.Ed.2d 111 (1959).

ing to provide transportation between Jacksonville and all points in Florida is not supported by substantial evidence.

In light of our disposition of the substantial evidence issue, we do not reach the question whether the Commission's grant of statewide authority was arbitrary and capricious.

Accordingly we affirm the decision and order of the ICC insofar as it grants Belford operating authority between Jacksonville and the supporting shipper's plant at Plant City, Florida, and we reverse insofar as it grants authority to Belford to operate to all other destination points in Florida and remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.