635 F.2d 891
 204 U.S.App.D.C. 33
 MELTON TRUCK LINES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Machinery Transports, Inc., Tri-State Motor Transit Co., of
Joplin, Missouri, Sawyer Transport, Inc., Intervenors.
 No. 79-1859.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 27, 1980.
Decided Nov. 24, 1980.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 William P. Parker, Oklahoma City, Okl., for petitioner. Wilburn L. Williamson and Richard A. Mize, Oklahoma City, Okl., were on brief.
 Dennis J. Starks, Atty., I. C. C., of the bar of the Supreme Court of West Virginia pro hac vice by special leave of court, for respondents. Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Richard A. Allen, Gen. Counsel, James P. Tuite, Deputy Associate Gen. Counsel, I. C. C., Barry J. Grossman and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on brief.
 Michael J. Norton was on brief for intervenor, Machinery Transports, Inc.
 H. E. Miller, Jr., Chesterton, Ind., entered an appearance for intervenor, Sawyer Transport, Inc.
 Thomas E. Leahy, Jr., Des Moines, Iowa, entered an appearance for intervenor, Tri-State Motor Transit Co., of Joplin, Missouri.
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and MIKVA and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 The Interstate Commerce Commission granted three carriers Machinery Transports, Sawyer Transport, and Tri-State Motor Transit authority to transport lumber, lumber products, and wood products from eleven Southern states to more than nineteen New England, Middle Atlantic, and Midwestern states. Melton Truck Lines, along with twelve other carriers, protested the applications before the Commission; Melton alone petitioned this court for review.[1] Melton challenges the Commission's order on two grounds. First, Melton asserts the absence of substantial evidence for the Commission's finding that the service offered by existing carriers is inadequate to meet public need. Second, Melton contends that the three carriers failed to prove the operational feasibility of the proposed services; in particular, Melton claims they neglected to show that the proposed operations could be run without substantial "deadheading" or movement of empty trucks. We reject both challenges and affirm the Commission's decision.
 
 I. Adequacy of Existing Service
 
 2
 Adequacy of existing service is one of the factors the ICC may weigh in determining whether the public convenience favors the grant of new motor carrier authority. See Pan-American Bus Lines Operation, 1 M.C.C. 190 (1936). This court has recognized, however, that "a finding of inadequacy of existing service is not always indispensable" to sustain the grant of an application. C&H Transportation Co. v. ICC, 589 F.2d 565, 573 n.16 (D.C. Cir. 1978), cert. denied, 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979). Nevertheless, Melton contends that the finding of inadequacy was pivotal to the Commission's decision in this case, and that the order under review must therefore fall unless substantial evidence supports the inadequacy finding.
 
 
 3
 We need not judge the centrality of the Commission's inadequacy of existing service finding. Central or not, the finding rests on substantial evidence. Twenty-four witnesses, who together ship more than 29,000 loads a year, supported the three applications. Their testimony established that, at the time the Commission considered the applications: (1) lumber production in the South was growing; (2) there was a trend to transport lumber by truck rather than train; (3) producers who shipped their goods privately preferred shipment by common carrier. Existing carriers, the testimony solidly indicated, were unable to meet the demand fueled by these three factors.
 
 
 4
 Complaints about existing service were not, as Melton suggests, either general in nature or confined to isolated incidents. Rather, several shippers described in detail their unsuccessful attempts to secure service from existing carriers;[2] others listed instances when existing carriers had picked up shipments late or otherwise provided poor service;[3] and some testified that the unavailability of common carriers forced them to ship goods privately, even when that course occasioned a loss for them.[4] This testimony revealed a continuing pattern of inadequate service, detailed in specific statements that do not bear the characterization, "isolated incidents."[5]
 
 
 5
 Melton contends, finally, that many of the shippers' complaints are attributable to the proclivity of lumber producers to demand carrier service on extremely short notice. Some of the testimony did indicate that short notice is common in the trade.[6] Neither the ICC nor this court, however, has a charge to restructure industry practice. If applicants have shown they can help meet an industry demand for quick pickups that existing carriers are unable to satisfy, then the public convenience is advanced by grant of the applications. In short, neither this argument nor any other Melton offers[7] weighs significantly against our conclusions that the Commission appropriately regarded the complaints in this case as illustrative of a general deficiency, and securely determined that existing service was inadequate to meet public need.
 
 II. Operational Feasibility
 
 6
 In 1973 the ICC issued a policy statement requesting applicants for new authority to demonstrate the operational feasibility of their proposed services. General Policy Statement Concerning Motor Carrier Licensing Procedures (Operational Feasibility), 38 Fed.Reg. 32, 856 (1973). Specifically, applicants were requested to show how they intended to return equipment from proposed destination points to proposed origination points. If an applicant admitted that the proposed service would result in the movement of empty trucks ("deadheading"), then the applicant was directed to specify the extent of empty operations by mileage and number of vehicles and to state where those operations would occur.
 
 
 7
 Melton contends that the Commission's finding of operational feasibility in this case was unsupported by substantial evidence. The Commission, unfortunately, has never identified the quantity or quality of evidence necessary to establish operational feasibility. This case, however, bears scant resemblance to cases in which applicants failed to show operational feasibility. On the record before us, we conclude that the substantial evidence requirement was satisfied.
 
 
 8
 Melton relies primarily on Guy Heavener, Inc. Extension-Sand, 129 M.C.C. 168 (1977), and American Farm Lines, Inc. Extension-33 States, No. MC-129908 (Initial Decision of ALJ Aug. 31, 1977). In Guy Heavener the Commission found that the applicant had not proved operational feasibility because "no traffic studies or other evidence was presented to show actual movements back to the point of origin." 129 M.C.C. at 180. Similarly, in American Farm Lines, the applicant introduced no traffic studies or other information to show the number of loads terminating in any of the origin or destination states. The applicant, moreover, lacked permanent authority to operate in the proposed destination states and gave no information about how it intended to retrieve trucks from those states.
 
 
 9
 In this case, all three of the applicants possessed prior authority to carry goods from the proposed destination states to the proposed origination states. All three stated that the proposed services would complement their existing operations. They believed that a grant of the applications would balance their operations and actually decrease the number of empty miles.[8] Machinery Transports and Sawyer submitted traffic studies, showing a significant number of loads originating in New England, Middle Atlantic, and Midwestern states (the proposed destination points) and terminating in the South (the proposed origination point), to substantiate these claims.[9] While Tri-State apparently did not submit a traffic study, it did offer, in addition to the evidence described above, a statement estimating that deadhead miles under the proposed service would be less than ten percent of total trip miles. J.A. at 220. We find this evidence significantly weightier than that tendered in any case in which the Commission denied an application for failure to prove operational feasibility. There is no indication that the Commission has ever required more evidence of operational feasibility than that presented in this case. Under Commission precedent, therefore, the finding of operational feasibility is adequately supported.
 
 
 10
 Because we agree that substantial evidence supports the Commission's finding, we need not pass upon other defenses the Commission presents to Melton's challenge.[10] We are troubled, however, by one of the positions the Commission presses. The Commission argued before this court that a showing of operational feasibility is not part of the applicant's prima facie case; rather, the showing is intended merely to aid the Commission in reaching its ultimate conclusion whether grant of the new authority would further the public convenience. The Commission contends it may waive the necessity of showing operational feasibility, therefore protesting carriers may not invoke the policy to attack the grant of an application.
 
 
 11
 Commission decisions display insecurity concerning the contours of the operational feasibility policy. On at least two occasions, the Commission has stated that proof of operational feasibility is not essential where an applicant shows a need for a service and backhaul traffic is unavailable. Timlaph Corp., 129 M.C.C. 367, 380 (1978); MDI, Inc., Long Prairie, MN Contract Carrier Application, 129 M.C.C. 346, 353 (1978). One of those decisions, however, admonished the applicant to adhere to the policy statement requirements in the future. Timlaph, 129 M.C.C. at 380. The policy statement itself is mandatory in tone. Yet the Commission has not offered any precise statement of the criteria it uses to gauge operational feasibility.
 
 
 12
 Unless the Commission comprehensibly shapes its operational feasibility policy, applicants for new authority will lack guidance on the evidentiary showing they must make and protesting carriers may find ambiguities in the policy an inviting basis for review petitions to this court. We therefore expect the Commission to clarify whether a showing of operational feasibility is a prerequisite to qualification for new authority and, if it is, the nature of the evidence necessary to make that showing.
 
 Conclusion
 
 13
 Under the Commission's precedents, the applicants have adequately established operational feasibility. Further, they have sufficiently demonstrated the inadequacy of existing service. Our review persuades us that the Commission's decision was supported by substantial evidence and was neither arbitrary, capricious, nor an abuse of discretion. We have suggested, however, that the Commission's operational feasibility policy bears sharpening.
 
 
 14
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 The three successful applicants are intervenors here
 
 
 [2]
 See Joint Appendix (J.A.) at 227-29 (Appendix A to Supplemental Testimony of Joe S. Dozier, Hoover Universal, Inc.), 243 (Statement of Grayden B. Moulthrop, W.S. Fox & Sons, Inc.), 259-62 (Statement of Frank Bullington, W.R. Bullington Lumber Co., Inc.), 276 (Statement of Tim N. Neff, Timber Products, Inc.), 317-18 (Statement of John W. Brown, Stringfellow Lumber Co., Inc.), 327-28 (Appendix # 3 to Statement of John W. Brown, Stringfellow Lumber Co., Inc.), 336-40 (Statement of Charles F. Bryant, Birmingham International Forest Products)
 
 
 [3]
 See J.A. at 246-47 (Appendix # 2 to Statement of Grayden B. Moulthrop, W.S. Fox & Sons, Inc.), 248-49 (Appendices # 3 & 4 to Statement of Grayden B. Moulthrop, W.S. Fox & Sons, Inc.) (copies of letters to ICC about poor service), 288 (Statement of Louie M. Pearson, Steel City Lumber Co.) (estimate that company experienced late pickups on more than 36% of loads), 299-304 (Appendix # 5 to Statement of Louie M. Pearson, Steel City Lumber Co.) (representative list of late pickups), 341-44 (Statement of Charles F. Bryant, Birmingham International Forest Products)
 
 
 [4]
 See J.A. at 224-26 (Supplemental Testimony of Joe S. Dozier, Hoover Universal, Inc.), 260-62 (Statement of Frank Bullington, W.R. Bullington Lumber Co., Inc.), 276 (Statement of Tim N. Neff, Timber Products, Inc.), 317 (Statement of John W. Brown, Stringfellow Lumber Co., Inc.)
 
 
 [5]
 Melton argues that even if these complaints were not "isolated," their number was de minimis when considered in light of the large volumes handled by the protesting carriers. As we recently stated in another context: "(T)here is no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate ... may be awarded." May Trucking Co. v. United States, 593 F.2d 1349, 1353 (D.C. Cir. 1979)
 
 
 [6]
 See, e. g., J.A. at 234 (Statement of Joel F. Donovan, MacMillan Bloedel Building Materials) ("In tendering shipments to these various carriers, we hope for pickup on the following day, and certainly no later than the second day.")
 
 
 [7]
 In its brief Melton argued that a number of protesting carriers had testified that they were already running empty trucks. Intervenor Machinery Transports, however, asserted in its brief that these trucks were unsuited for carrying lumber. Melton did not press the point in its reply brief or at oral argument
 
 
 [8]
 See J.A. at 62-63, 210-13, 220-21
 
 
 [9]
 Melton argues that Sawyer's studies show that Sawyer already has too many loads originating in the South. It is true that at the time of the traffic study Sawyer was originating substantially more loads in North Carolina and Texas than it was receiving in those states. In several other Southern states, however, Sawyer was experiencing a serious imbalance in the opposite direction. The Commission could reasonably conclude, therefore, that a grant of the new authority would help Sawyer to balance its operations and reduce deadheading
 
 
 [10]
 The Commission argues, for example, that Melton failed to attack the showing of operational feasibility below. While we agree that this court normally should not address issues raised for the first time on appeal, we find it unnecessary to rest our decision on that ground